## UEBERWEG v. LA COMPAGNIE GENERALE TRANSATLANTIQUE.

(Circuit Court of Appeals, Second Circuit. March 12, 1894.)

### No. 63.

COLLISION BETWEEN STEAMERS—OVERTAKING VESSEL.

Two steamers were going on parallel courses, abreast of each other, and about 250 feet apart, when the faster of the two changed her cour. e one point towards the other, and the two vessels collided about a minute later at an angle of about 15 deg. There was some ev dence that the other vessel also deviated from her course, but this was not clear y proved. *Held,* that the collision was caused by the negligence of the faster vessel in thus changing her course.

Appeal from the Circuit Court of the United States for the Northern District of New York.

Libel by Julius Ueberweg, master of the steamship Switzerland, against La Compagnie Generale Transatlantique, owner of the steamship La Gascogne, for damages caused by collision between the two vessels. The district court dismissed the libel, (38 Fed. 853) and this decree was affirmed by the circuit court. Libelant appeals. Reversed.

H. G. Ward and Wm. II. Stayton, for appellant.

Edward K. Jones, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The district judge, who tried the cause, hesitatingly inclined to the opinion that the weight of the evidence was on the side of the Gascogne. The findings of fact of Judge Benedict were as follows:

"These are cross actions arising out of a collision which occurred on the 21st day of January, 1881, in the harbor of New York, not far below the statue of liberty, between the steamship Switzerland and the steamship La Gascogne, two passenger steamers at the time bound out of the port of New York on a voyage to sea. The Gascogne was the faster vessel, and, having come up with the Switzerland, was passing her, on her port side, at a distance estimated by various witnesses at 150 to 300 feet. The bow of the Gascogne had drawn ahead of the bow of the Switzerland when the vesse's came in collision, the Switzerland's bow striking the Gascogne on her starboard quarter at an angle of about 30 degrees. To recover the damages resulting from this collision to the respective vessels, each vessel has brought an action against the other. The collision occurred in broad dayl'ght, on a clear day, with no other vessel to interfere with the navigation of either vessel. It is manifest, therefore, that the collision was caused by negligence, but where the negligence was is not so clear. The contention on the part of the Switzerland is that the Gascogne, instead of keeping her course, as she was bound to do, until she had passed the Switzerland, attempted to cross the Switzerland's bows, under a port helm, when the distance between the vessels was too small to permit her to accomplish such a maneuver in safety. On the part of the Gascogne the contention is that while she was passing the Switzerland, and holding her course, at a safe distance, the Switzerland, instead of keeping her course, as she was bound to do, suddenly swung over to the eastward, and struck the Gascogne upon her starboard quarter."

Further facts in the case are that the speed of the Gascogne was about 15 knots per hour; the speed of the Switzerland was 9 or 10 knots per hour; that a strong northwest wind was blowing; and that the Switzerland was carrying a port helm, to steady herself

against the wind. There was testimony that, with such wind, "momentary carelessness on the part of the men at the wheel would be likely to be followed by a swing of the steamer's head to the eastward, which would carry her some distance to the east of her course before it could be stopped by the helm." Her witnesses said that the cause of this porting was the dangerous approach of the Gascogne towards the Switzerland's course. The testimony inclined the district judge to hold that the emergency which caused the sudden porting was not a change of course on the part of the Gascogne, but was the necessity of overcoming a swing to the eastward which the Switzerland had taken in the strong northwest wind. He was manifestly helped to this conclusion by the averment— which he found to be true, and which was not strongly controverted by the Switzerland—that her bow struck the Gascogne's starboard quarter at an angle of about 30 deg. If this was the fact, it would go far to sustain the theory that the Switzerland was the aggressor.

Much new testimony was taken by the appellant for use before the circuit court, and in some respects a new case is presented. The theory of the Switzerland's libel was that the Gascogne, as she began to draw past the Switzerland, sheered over towards her under a port helm, whereupon the Switzerland put her helm hard a-port, but the Gascogne, continuing under her new course, drew across the bows of the Switzerland, striking her a little forward of her mizzen rigging, on the bluff of the bow, her port anchor penetrating the starboard quarter of the Gascogne. The theory of the Gascogne's answer appears in the testimony of her captain, who testified that when the Gascogne's bow was about the middle of the Switzerland, and the vessels were 150 to 300 feet apart, the Gascogne changed one point to starboard, in order to take exactly the direction of the channel, which there makes a small bend; that the vessels continued on parallel courses, but when the bow of the Switzerland was a little aft of the Gascogne's bridge the former briskly made a movement to the port side, and immediately collided with, and struck her bow into the starboard quarter of, the Gascogne, about 90 feet from her stern. The Gascogne's pilot testified that when the Switzerland was about one length ahead of the Gascogne the former changed her course slightly to the eastward to let a schooner pass on her starboard side; that he accordingly changed the Gascogne's course to the eastward about one point; that the Switzerland hauled up on her course again as soon as she rounded the schooner, when he hauled up on his course about one point, and that, when he straightened up on his course again, the Gascogne's bow was about abreast of the Switzerland's bridge; and that the vessels were on parallel courses. La Veuve, a quartermaster, and at the wheel of the Gascogne at the time of the collision, testified that when the bow of the Switzerland was about opposite her smokestack, as he supposed, the pilot changed the Gascogne's course one point of the compass to starboard, and that the collision took place about 90 seconds thereafter. He changed the time afterwards to about 30 seconds. The captain of the Gascogne has consistently given the same version of the movements of his vessel, and his ac-

count is to be taken as true,—that at the time named the course was modified in order to conform to the direction of the channel. Before this change the vessels were on parallel courses, abreast of each other, and were probably about 250 feet apart. The appellant urged before the district court that this change of course on the part of the Gascogne was the direct cause of the collision. The appellee insisted that it could not have produced collision at an angle of 30 deg. Lieut. Chambers, of the navy, the expert for the appellee, testified that if the Gascogne ported a point, and the Switzerland held her course, the vessels being at the time of porting between 200 and 300 feet apart, they would have collided in about a minute and a quarter, but at a very short angle. The district judge thought that the porting of the Gascogne would not account for the collision, and did not tend to produce it, and further thought that the angle of incidence disproved the account given by the Switzerland's witnesses,—that when their helm was ported their vessel came up to the wind four or five points before the blow. The new proofs on the part of the appellant were taken to show the slowness of the movement of the head of the Switzerland under the mere influence of the wind, the proper practice in regard to passing steamships upon parallel courses, and that the blow was along the bluff of the Switzerland's bow, and not against her stem. The appellee offered evidence in contradiction of these points, and especially that the wound upon the Gascogne showed that it was caused by the Switzerland's stem.

It is manifest that there was no attempt or wish on the part of the Gascogne to cross the bows of the Switzerland, and that there was no intentional attempt on the part of the Switzerland to swing over to the eastward. The reason for such a swing rested upon the hypothesis of momentary carelessness. The new testimony in regard to the insufficiency of brief carelessness, if it existed, to cause such a sheer as the Gascogne's witnesses assert was taken, causes at least a hesitation to adopt the supposition of carelessness, and leaves the important question in regard to the truth or probability of the Gascogne's theory to be solved by other or proved circumstances. The circumstance which gave probability to the testimony of the Gascogne's witnesses was that the stem of the Switzerland struck the quarter of the Gascogne at an angle of 30 deg. If, on the contrary, the starboard quarter of the Gascogne, as she was proceeding on her crossing course after the change of one point, struck the bluff of the Switzerland's bow at an angle of 15 deg., the new testimony changes the features of the case which were presented to the district judge. Especially is this true when the respective experts do not disagree that, under the conditions stated by Lieut. Chambers, a collision would take place somewhere, and at some angle.

The appellee has introduced the testimony of Mr. Dickey, who repaired the Switzerland and saw the Gascogne, and of Mr. Clark, mechanical engineer in the service of the owners of the Switzerland, and photographs of the injuries upon both vessels, and the official report of the survey of the Gascogne. While the libel of the ap-

pellant alleged that the injury was received by the Switzerland on the bluff of her bow, no substantial attempt was made to support that averment by testimony in the district court, and it was not until the importance of the angle of incidence had been dwelt upon by the district judge that proof was offered. This creates a natural distrust of the genuineness of new testimony, but the photographs of the Switzerland were taken immediately after the collision, and were not a new creation. Upon them the testimony of Mr. Dickey, the superintendent of her repairs, and the computation of Mr. Clark, are substantially based. These proofs show that the Switzerland did not strike the Gascogne with her stem, but that the first point of contact was about 18 feet abaft the stem, on the upper part of her port bow, and that the injury ended just above the fore foot on the stem, and did not extend the length. The appellee insists that a well-defined indentation on the Gascogne shows that the first point of contact was with the sharp corner of the stem of the Switzerland. · It is well established that the Switzerland's anchor broke into the side of the Gascogne, and that the two vessels became fastened together. The indentation cannot be relied upon to prove much in regard to the first point of contact, and there is about as much evidence from the Gascogne's wounds, and the known incidents of the collision, that its injury was not inflicted by the stem of the Switzerland, as that it was, while the known appearance of the Switzerland's wound pretty clearly shows that the angle must have been from 15 to 20 deg.

The case, upon appeal, stands in this condition: The Switzerland and the Gascogne were, when the latter ported, upon parallel courses, about 250 feet apart, and abreast of each other. The Gascogne was an overtaking ship, and could not deviate from her course, to the injury of the overtaken vessel. It did deviate, and this deviation, contrary to the testimony in the district court, could have produced the collision at the time when, and in the place in which, it occurred. The sufficiency of the cause upon which the district judge relied, of a swing of the Switzerland to the eastward, is weakened by the new proofs; and the angle of incidence, which went to show that it must have occurred, is diminished. The probabilities that it did occur are lessened, while the probabilities that the collision was caused by the act of the Gascogne are increased; and the supposed inconsistencies between the testimony of the witnesses on board the Switzerland and the proved circumstances do not exist. The proofs, as they now stand, call for a finding that the collision was caused by the negligent act of the pilot of the Gascogne, in deviating from his proper course, and that the Switzerland ported as soon as she perceived the change in the Gascogne's course. The decree of the circuit court is reversed, with costs, and the cause is remanded, with instructions to ascertain the damages, and render a decree for the libelant for the full amount of damages, and for the costs of the district court, disbursements of the circuit court, and for the costs of this court.